Mr. Trella, you're starting. I am, Your Honor. Okay. And you've split your time, so you'll be starting you off at six minutes. Thank you, Your Honor. Good morning, and may it please the Court. Because of the constraints of a divided argument, my plan was to jump immediately to the summary judgment of non-obvious  My new plan is to jump immediately to the questions the Court posed on Friday. The Court asked a couple of questions relating to the indefiniteness defenses that Valois and Rexam raised in the District Court. I'd like to address the second of the Court's questions first, and that has to do with the Court's jurisdiction over the appeal as a whole. The answer to that is that no matter what happened with respect to indefiniteness in the District Court, this Court has jurisdiction over the appeal as a whole. The appeal was brought under 1292A because the District Court entered injunctions. Appeals under 1292A do not require the entry of a final judgment that disposes of all claims as to all parties. And in fact, the District Court never entered such a final judgment in this case. What it did was it entered two injunction orders based on its finding that two defendants infringed two of the asserted claims. I realize this is mostly an issue for Rexam, but what became of the counterclaims in this case? Well, in fact, Your Honor, nothing became of the counterclaims. If you look at the Court's post-trial order, the first few pages, he identifies the counterclaims. He goes through the counts and the counterclaims, but then you never hear about the counterclaims again. And at the end, he says what he's disposing of, and he disposes of the various counts and the infringement counts, never talks about the counterclaims and says, I'm not entering a Rule 58 judgment now, I'll enter it later, and that never happened. So, in fact, the counterclaims were never resolved. Now, as to Valois' indefiniteness defense, and I'll obviously let Mr. Winter talk about Rexam's, Valois moved for summary judgment that the claims as construed, as the quench limitation was construed, were indefinite. The Court denied that motion, and in the course of doing that, made it clear that he was rejecting that indefiniteness defense outright. That's clear from the ruling, and it's also clear from the way the parties in the Court conducted themselves thereafter. This is just on the quenching point. Yes, that was the only indefiniteness argument that Valois raised. Right at the outset of the indefiniteness ruling on Valois' motion, and that's at 141 and 142 of the appendix, the Court states that it's denying the motion, quote, because the term quenched is sufficiently definite for construction. The Court explained that in its view, if a claim was amenable to construction, it can't be indefinite, and it holds that, quote, plaintiff's patent is not indefinite as a matter of law for four reasons. Now, I suppose there are a couple of ways you can read that statement, but the discussion that follows makes it clear that what the Court was doing was holding as a matter of law that the claims were not indefinite. Somewhere in the analysis, there's a point, I think it was reason five or something that talks about the fact that there's a factual dispute. No, not as to this one. In fact, and that's an important point, Your Honor. At no point did the district court ask to this indefiniteness defense say anything about any factual disputes. In fact, he goes through his four reasons why they were not indefinite as a matter of law. He says one trained in the art would understand the term's meaning, which is the indefiniteness test. He says a reasonable jury would be able to determine whether a tube is rapidly cooled. In other words, his construction of quenched was sufficiently definite. Can I ask you, did you make an argument on this, your indefiniteness piece, that if there had been this immersion addition, immersion in a cooling medium, whether it's liquid or air, it doesn't matter because you made that pointed oral argument, that rapidly cooled was just too uncertain? You mean without the immersion? No, if there had been this immersion part of it, that it would still be indefinite because who could tell what rapid means? No, we did not. We said if he had adopted the dictionary definition, which was shock cooling or rapid cooling by immersion in a cooling medium, we did not claim that that was indefinite. I'm sorry to do this, in part because time is so limited, and maybe you're not the right person to ask this question, but why is Claim 19 infringed since it doesn't cover EFEP? Claim 19, I think, does cover EFEP. Claim 19 is the dispenser assembly of Claim 15, wherein the fluoropolymer is ethylene tetrafluoroethylene. That's ETFE. That's EFEP. I think they're the same thing. Well, I'm not sure that they are. I mean, the way that Daiken describes EFEP, they take ETFE and they mix it with some other stuff and they add some propylene stuff to it. This is just a – I guess maybe it's just confusion on my part, but I just don't understand. And it may make a difference because that one is specific to a particular fluoropolymer where it's 15 is broader, and therefore the validity arguments might, in fact, be different. But I don't really understand why – maybe somebody can explain to me why we're talking about Claim 19 when the accused products use EFEP. Yeah, I think they're the same thing, Your Honor, but I could be wrong. But hopefully somebody else can address that. Can I go back to your number judgment point, though? Yes. The court – did the court ever actually say that I'm entering judgment on this indefiniteness issue as a matter of law in favor of your opponent? What he said was that the claim is not indefinite as a matter of law. Now, it didn't enter judgment, as I was saying, ultimately never entered judgment on the counterclaims, but said it's not indefinite as a matter of law. That's at A141. Right, which sounds like a denial of a summary judgment. Well, it could be either one, but I think the discussion that follows where he said – he goes through his four reasons. Each of them is ruling as a matter of law, and, of course, indefiniteness is a question of law. Never identified – never suggested that there was any question of fact that needed to be resolved. And also the parties proceeded that way. The opening statements of both parties reference indefiniteness as having been decided. When the judge, at the beginning of his post-trial finding, says, you know, this addresses the remaining issues for trial, he goes through a laundry list. That's not on there. So I think – and I just would note, although obviously what the parties say doesn't resolve jurisdictional issues. Page 1 of MWB's brief says that the court rejected Valois' indefiniteness defense, holding that the term quenched is amenable to construction. So I think the court's order makes clear that he was rejecting it as a matter of law.  Just on quenched, why isn't it enough that just focusing on the accused's product, you put this extruded to – through a chamber which is temperature capped, and it's temperature capped at a level dramatically lower than the temperature of the polymer coming out of the extruding device. And you keep it that way by passing cold water underneath the air to make sure it never goes over, I don't know, 95 degrees or something. Why isn't that enough for common sense immersion in a cooling medium? Well, because it isn't immersed in a cooling medium, Your Honor. First of all, the air temperature, while it is lower than the temperature of the tube, it's 30 degrees higher than the ambient air temperature in the factory. And nobody would suggest that just letting the tube come out of the extruder into the factory is quenching. And here you've got – I'm not sure nobody would suggest that, but whatever that may be, when you take a, I don't know, what is it, 5,000 or something degree tube coming out, and you put it into a chamber whose entire purpose is to have a shocking difference between the temperature of the air surrounding, or in this case air, but it could be a liquid, in order to force convection. Why isn't that enough? Well, it isn't forced convection, Your Honor. It's free convection, and that's really the difference. You don't have, and that's why immersion when you're cooling these tubes is important, because you get the cooling medium inside the tube and around the tube, and here it's just being drawn slowly through this very warm air. Of course it cools because it is cooler, but the point of quenching isn't just cooling. In fact, the quenching limitation was added during prosecution to avoid rejection based on just normal cooling. You need more, and what you need is the shock cooling by immersion in a cooling medium. Did you really argue immersion as an issue below? I mean, your friend on the other side says this is a whole new argument, that your claim construction debate below really was whether it had to be liquid. Well, Your Honor, I think if you see the, and we quoted the argument from the Markman hearing, where we said the key is immersion in a cooling medium, and it can be liquid or it can be gas. So I think we did argue that, Your Honor. I know they made the argument that we didn't, that this is some sort of a new argument, but that's just not true. You can read the transcript of the Markman hearing, and as I said, we quoted it in our brief. It couldn't be clearer. I see that I'm… You are, but I'd really like it for you to turn briefly on the summary judgment of obviousness. Yes, I would love to do that, Your Honor. Your Honor, what we have here is a simple substitution of one prior art material for another one in a prior art structure. Can I ask you just about how things went down? Because one of your main arguments on appeal here is that, well, we're left with claims 15 and 19, and those aren't limited to fragrance. So all of the stuff about carcinogens that the district court almost exclusively relied on is kind of… Did you make that argument on summary judgment? Did you parse through the different claims in your summary judgment briefing? Well, Your Honor, first of all, as I think you know, there were other claims all at issue. Right. But we did make the point that as to some of these claims, and it ends up being the ones that he found infringement of, the carcinogen thing doesn't make any difference because they claim dispenser assemblies. They don't claim fragrance dispensers. They don't claim products for human use. Well, what kind of liquid would you be happily dispensing if it had a threat of being carcinogenic? Well, let me first say that the evidence that there was a concern in the art about this being a carcinogen, that evidence doesn't exist. Diken promoted EFEP for use in medical products, in beverage dispensing systems, in a variety of products for human use. The FDA had approved a lot of fluoropolymers. So all of the defendant's own employees that were afraid of it, that they were just mistaken? One defendant's employee, Rexham's Vincent Ravy, who was not a person of ordinary skill in the art. That's a polymer engineer or a chemist, and the parties agreed on the level of ordinary skill. He's the only person who expressed any sort of concern, and that way he was not purporting to represent the consensus view of person's skill in the art. He was asked about Rexham's thinking, and that's what he said. Let's go back to my question. Let's assume that you're wrong on that point. Let's assume we disagree with you on what the prior art shows and whether or not there was teaching away as it relates specifically to EFEP. What kind of liquid dispenser would someone be comfortable putting carcinogenic products into? That's a fair question, and I'll refer the court to MWB's own brief where they talk about EFEP was only suitable because of the supposed carcinogen concern. For industrial applications, all sorts of liquids are dispensed in industrial settings. In a chemical plant, you have liquids being dispensed. Because the focus had been on fragrance containers, you're thinking about a pump bottle and all that, but these claims aren't limited that way. This is just a dispenser assembly that happens to have a tube that goes down into the liquid. It can be any of a host of liquids, literally any liquid, because these claims are not in any way limited to the kind of liquid. On that point, could the parties please provide in a very timely way? I at least couldn't access the summary judgment briefing because it was confidential. Could the parties please provide that? We absolutely could, Your Honor. A couple of other points on obviousness. MWB argues about extruding and quenching as somehow being novel. That was not novel at all. In fact, when they were trying to avoid inequitable conduct in the district court, they admitted that this was known. The DuPont guide, which the examiner hadn't considered, identifies extruding and quenching as a standard way of processing fluoropolymers and making tubing. They also say that while they tested to discover the refractive index of fragrances, well, that's not a discovery. That's an inherent property of prior art materials. Atlas Powder makes clear that that's not an invention. Also, the examiner at page 1037 of the appendix said the prior art teaches that fragrances have refractive indices between 1.3 and 1.8, which is the exact range that covers all of this. I've talked far too long. Thank you. Now, Mr. Winter, I guess we'll give you – your time has pretty much run out on your side, but try to hold it to a couple minutes if you can. Well, I asked for a five-minute and two-minute rebuttal, but I want to cover two issues. But the appellant's argument normally is a split argument for the time. Anyhow, I've got to go right now. I think I want to address your letter Friday. Basically, the judge's ruling in this case says the court holds that plaintiff's patent is not indefinite as a matter of law for six reasons, and they list all the six reasons relating to XRD crystallinity. Secondly – Just to be clear, the sixth reason or one of the reasons is they're a factual dispute. The second thing is that the language you just read is perfectly ambiguous about what the not covers. So that doesn't do it. What did you ever in proposing findings of fact and conclusions of law or otherwise at the trial or sometime prior to the trial say, we still have an indefiniteness defense that hasn't been disposed of. We want to litigate it. Well, first of all, I disagree with you on the last thing, that there are fact issues. The court said there were morally molding infringement fact issues. The court never said that there are fact issues of indefiniteness. And you'll read his ruling 8-133. Finally, both defense were able to make appropriate calculations even though the patent itself is not specific. I'm sorry. I can't not interrupt. A-132. Finally. 33. A-132 is what I'm reading from. Oh, okay. Finally, there are material issues of fact remaining for the jury. And it will be the finder of fact's responsibility to determine whether there was sufficient information to test for crystal entity. This is the sixth of six reasons all under the single paragraph that begins with that ambiguous statement about not indefinite as a matter of fact. But later, when discussing morally molding, the court says, accordingly, this court holds. Where were you reading from? A-133. Accordingly, this court holds in like manner as the federal circuit. And they're referring to morally moldings and deny his motion, Rex's motion, for judgment as somebody's attempt to test indefiniteness. And so basically what they're saying is we're going to do infringement analysis under morally moldings and not indefiniteness. And I think the second thing that's very important is that the party stipulated the patent lists 11 parameters that must be used. The party stipulated that at least those 11 parameters had to be used. And it was clear that there were missing parameters. The court, in its first reason, found that stipulation to be an admission that the patent was definite as a matter of law. So if we were to go to trial, how would that stipulation change? How would the judge hear evidence on a stipulation that he found to make the patent definite? That's cited as the first reason. So how am I going to try a case to change that stipulation? The stipulation clearly is open-ended and envisions other things. Now, secondly, on this issue, you asked about the proposed findings. Meade-Westphalco's proposed findings state specifically that the court's August 18, 2011 memorandum of opinion found that the claim terms, XRD, and Crisler content were definite as a matter of law. So basically, Meade-Westphalco came in and said that they were definite as a matter of law in their proposed findings of facts and conclusions of law. Can I ask you the same question about supplying something? I think I'm right in saying that we looked on PACER for the proposed findings and conclusions. They were also confidential. That's true. We can supply them immediately now or after the argument. Yes, they weren't in the appeal record because this issue hadn't been raised by Meade-Westphalco. Can I ask you, not on this waiver issue, including whether a waiver was waived, but on an aspect of the X-ray crystallinity? Can you explain to me in terms that I will hope to understand what exactly this difference is between relative crystallinity and absolute crystallinity? Here's what I'm focusing on. I took it, particularly from the other side's brief, that relative crystallinity meant only if you had two specimens, you can get a result that this one is more crystalline than this one. If that's all it means, I don't understand how this claim could possibly be about that because it says it's a percent of crystallinity. Yes, I think that their view on what relative crystallinity is correct in the sense that you use a set of parameters, you get a crystallinity result that is not exactly what's inside the sample, but it's useful in an industrial process. Let's suppose you're now producing 100 of these tubes and you want to make sure they're the same crystallinity. Well, you put them through the same parameters and the same test and you get a relative difference. And that relative difference tells you whether the crystallinity is the same. That reading does not say exactly what the crystallinity is. Absolute, on the other hand, is a reflection of the crystallinity in the sample. Like if you had x-ray vision and looked in the sample and you saw it was 23%, like our expert testified, 23% of the crystals, 23% of the material would be crystalline. The rest would be amorphous. So there's a wide difference. And this is a segue into an important case that happened two or three days ago, Teva versus Sandos. It came down last week. And basically that case is right on point. The claim has molecular weight in it. There's three ways to measure molecular weight. The district court found that to define which one it was in the patent, what they did is hire two competing experts. The expert, the court believed one expert, and the case went on appeal. The federal circuit, in that opinion, said no. Basically, it's indefinite because you can't tell which molecular test to do. And so that case is right on point. It happened a couple of days ago. I don't even have a sign. I have a website. But in that case, they found that a portion of it was indefinite because they believed that ambiguity had been essentially injected into the term during the course of the prosecution. Isn't that right? And that's precisely on point in this case. If you read the prosecution history, Drobny reference has high crystallinity of 60. But Drobny does not disclose how that crystallinity was arrived at. So that crystallinity is absolute. And what they did in the prosecution is say, well, our crystallinity, which they didn't disclose as relative, is lower than Drobny, which is an absolute reading. They're comparing apples to oranges to get the patent allowed. That's exactly what happened in Teva. Exactly. Although Teva was a little bit worse because they said it was one thing in one case and another thing in another case. So basically, this is a situation where Teva is directly applicable. And I think the judge on the infringement issue found specifically the patent did not say whether it was absolute or irrelevant. There's a finding in the infringement area. So we have the same thing. We have what should have been in the patent now decided by a contest of experts. And I think this should concern the court beyond everything because now the third party on the West Coast who wants to test, what do they do? I think we have your argument. Thank you very much for your time. We've obviously gone way over in terms of the time. So why don't we give you another 10 minutes for your time, which I think they exceeded, the amount that was exceeded, or five to 10 minutes. We hope you use less. Thank you, Your Honor. I appreciate your accommodation. Anthony Viola from Edwards, Wallen, Palmer for the police. May it please the court. I also would like to begin by addressing the question, particularly with respect to Wrexham, as to whether the denial of summary judgment is appealable under the final judgment rule. As the court pointed out, what the district court decided with respect, particularly to the- I'm sorry. The really critical thing for you is did you ever suggest, ever argue that, and I don't think, I'm not sure you did. I guess I'd be inclined to think that you did in your brief, that indefiniteness was essentially waived because they didn't pursue it after the summary judgment motion. So haven't you waived waiver? Well, I think we did argue the flip side of it in our papers. But in any event, to the extent that the court, the final judgment rule divests the court of subject matter jurisdiction, that is not waivable. We have an injunction here. We have jurisdiction over the appeal. We're just talking, at least I'm just talking about whether they lose their indefiniteness challenge on appeal because they didn't pursue it at trial after summary judgment. The other way was denied. You would ordinarily expect that you don't win on summary judgment. That doesn't mean the issue is over. And the question is did you ever make that argument? It seems to me your brief engages completely on the merits, on the assumption that they're right in saying that the summary judgment ruling was effectively a summary judgment for you on that issue. What we argue, Your Honor, is that the way in which the case was tried solely on infringement is inherently incompatible with an indefiniteness claim. With respect to Rexham and particularly pages 38 to 42 of our brief, we make the point that they don't have an indefiniteness argument. They've got the wrong standard and they've mixed up the law. And that, quote, nor did Rexham assert that the claims were too indefinite to permit XRD testing. This is talking about what went on at the trial. Did we use the word they waived this? No. That's Your Honor's question. I think you won't find out. Is it right that in whatever documents, first of all, was there a pretrial? I assume there was not a pretrial order. But was there something in which the parties and the court said here is what this trial is going to be about? And if so, was indefiniteness on that list? There were proposed findings of fact and conclusions of law submitted by all of the parties. And interestingly, when you ask the question of Rexham's counsel whether they mentioned indefiniteness in their proposed findings, he didn't answer you. He said we mentioned it in ours. The defendants did not anywhere in any memoranda of law before or after trial or any proposed findings of fact or conclusions of law ever state that they were preserving an indefiniteness argument. As a matter of fact, we did a word search of the 13-day trial transcript for indefiniteness, and it is never mentioned in the context of them preserving that argument. What about his point that at least one of the reasons given by the district judge on the summary judgment really foreclosed the issue, namely the reason that since they agreed to a construction, the term must be construable? Well, it's very interesting. What Rexham argues now on appeal is that what the parties agreed to was at least certain parameters, and that the fact that other parameters of XRD testing are not included renders the claim indefinite. And the trial court at page A132, again, amongst several other reasons, said, finally, there are material issues of fact remaining for the jury. In this case, it ended up being tried to the bench, but for the fact finder. And it will be the finder of fact's responsibility to determine whether there was sufficient information to test for crystallinity. So the court expressly said, one of the reasons of denying this motion is because there are fact issues. And we argued in our brief repeatedly over and over again that the way in which the defendants, particularly Rexham, tried this case is incompatible with indefiniteness. Because they put an expert up to say there's only one issue of the trial, infringement and the remedy. They put up an expert to say, I understand this claim. I know how to do the XRD testing that's intended in this claim. I've applied that to the accused product, and it doesn't infringe. Once you do that, you can't say it's indefinite. Now, there were other ways in which the defendants could have chosen to try this case. They could have put up an expert, for example. I'm just thinking, if it were absolutely clear in the summary judgment ruling that the indefiniteness issue was gone, then you appropriately adjust your testimony at the trial. And that testimony can't have anything to do with the indefinite issue, which has already been determined. So if reason number one or two, or whichever one it was in the summary judgment ruling, that you agree to a construction so the thing is construable. And by the way, I've got four or five additional backup reasons, but none of them are actually material to the outcome because I've construed it, and therefore it's construable, and therefore it's not indefinite. I guess I don't really understand how one can fault them on that reading of the summary judgment order for not pursuing the matter at trial. Well, I think the answer lies, Your Honor, in Rexham's argument and the agreed upon. Remember, with respect to XRD crystallinity testing, the court didn't construe that term necessarily other than accepting the party's stipulation, that it meant at least the following. And now Rexham tries to argue now that at least leaves other parameters undefined and that that renders the term indefinite. Well, that's a fact question. They had to prove that by proving convincing evidence at trial. They didn't put on any evidence that the person of ordinary skill in here would be unable to supply those additional parameters. In fact, they abandoned that argument by putting up an expert who said, yes, I understand what it is. Here are what I believe those are the parameters. Can I ask you a question on the merits of this issue? The same question that I asked Rexham's counsel. Can you explain how, in a way that I might be able to understand, the difference between the relative and absolute crystallinity measures? And how, given that I think your referee says at 41 that the technique that you used, that your tester, your expert used, was one of relative crystallinity using the Dodd's manual or something. How could this claim, which says a percent, 13 percent, be anything other than an absolute? Here's my understanding, Your Honor. The best I can do is give you my understanding. And I think Rexham's counsel was getting at this when he said absolute is if somehow or other somebody could look at the atoms in this material and count them up and say, how many are in an amorphous phase and how many are in a crystalline phase, you could do an absolute percentage of which is in which phase. XRD does not do that. What XRD does is it shoots X-rays through the material and the X-rays scatter differently depending on whether they pass through the amorphous phase of the material or the crystalline phase. And you get a film and you have these different scatters. So it's relative because you're not actually looking at the material, you're looking at the scattering that occurs from the X-ray. And what they do is they take the relative amount of Debye rings, which are scattering. What is relative to what? I took it to be, and I took it from your red brief at 41, that what you put on either side of that word relative is one specimen relative to another specimen. Is that wrong? I don't think that's what we said, your honor. I'm looking at page 41. And this is a we had a whole section in our brief later on that discusses XRD crystalline testing and how it works. Right. And that left me at least confused. So I'm trying to understand more than I got from the brief. It's relative in the sense that you're counting X-rays and how they scatter and you're doing count of how much of the X-rays scatter versus how much of them. I'm sorry, how many scattered due to amorphous phase and how much scattered due to relative phase. So you get a result and the X-ray result is repeatable and consistent from sample to sample to sample to sample. However, if one uses an entirely different method of measuring crystallinity, for example, DSC, which involves heating the material and extrapolating crystallinity based on the temperature at which it melts at various points. You're going to get a crystallinity percentage that's going to be repeatable from DSC to DSC to DSC on different samples. It's not going to be the same number that you get with XRD. But that doesn't mean that the XRD is not repeatable and consistent from sample to sample to sample. What does 13% mean in that context? Well, what the patent says, Your Honor, is, I'm sorry, at these claims it says having an XRD crystallinity not greater than 13% and the authors of the patent are very clear at the bottom of column four to say we're measuring this by XRD. If you measure it in a different way by DSC, you might get a different answer. So please make sure you always use XRD. That's all that relative means. It means we're not counting the atoms, but we're using a scientifically accepted and repeatable method to extrapolate the crystallinity. It doesn't mean that if I do this same test on the same sample ten times, I'm going to get ten different answers. Let me, before we get off of this question where we started, I want to make sure that I understand, because you keep emphasizing Rexham's summary judgment motion. I take it that you would agree then with perhaps with Mr. Trella that O.W.A.D. is slightly different circumstance. I do think that the language used by the district court in denying summary judgment to Rexham is not, I'm sorry, to Valois is not as clear as Rexham. The court does mention in page A142 that there are tribal issues of fact here. It says the term is amenable to construction, and while Valois claims that rapidly cooling lacks clear demarcation, indefiniteness does not require potential infringement to be able to ascertain the nature of the accused product, and says that a jury can determine what rapidly cooled is. I think the court is saying there are fact issues for infringement there. I'm not entirely sure. It's saying there are fact issues. With respect to Rexham, the issue is far clearer, because it does say there are fact issues. I just wanted to make sure that you see it. I think in all fairness, Your Honor, that I think that the fact issues mentioned there go to infringement. However, the arguments that we made in our brief with respect to the way in which Valois tried the case are equally applicable, because Valois also chose to try the case by saying, here is our expert. The expert understands what quenched means. He has come to a definition of it. He has applied his definition to the accused product, and he is here to opine that it does not infringe. How can one say that the claim is indefinite? That argument not being preserved anywhere, again, in any pretrial memorandum or findings of fact filed by Valois, the two are entirely inconsistent. I guess this is a little bit more back on the Rexham side. Are you defending the proposition that if the parties agree to a construction, that's the end of the indefinite inquiry, even if what they agree to is itself something that doesn't supply a skilled artisan with the ability to determine the boundaries? I don't think that that question is presented here, Your Honor. Here we have a situation where the parties agreed to a construction of at least certain parameters, certainly at least left other parameters to be open, and then my own position is it became a question of fact if they wished to pursue that at trial as to whether that rendered the claim indefinite, and they chose not to because they put up an expert who said, I understand what those other parameters are and what they should be. So the issue you're raising wasn't presented here. I think I have one question I asked the other side that I wanted to ask you about, and since it's your patent, maybe you can know better. Why are we talking about Claim 19 here? Yes. So Claim 19 is dependent from Claim 15, and it states the dispenser assembly of Claim 15, wherein the fluoropolymer is ethylene tetrafluoroethylene. Which is ordinarily called ETFE. Well, if one looks at Column 4, line 21. It doesn't matter what it's ordinarily called. EFEP is not ethylene tetrafluoroethylene, is it? It defines ethylene tetrafluoroethylene as EFEP there. It doesn't matter what it uses EFEP for. What matters is the product, Daikin's EFEP. Is that ethylene tetrafluoroethylene? Yes. That's my understanding, yes. Really, even though they say in their description of it, first of all, the initials don't actually mean that. Never mind whether the claim drafters used it a different way. The P is for something that's not in ethylene tetrafluoroethylene. The P is for propylene, and I think the Daikin documents describe their preparation of this material as starting with ethylene tetrafluoroethylene and mixing it with some other stuff, including some propylenes. I'm looking for the Daikin... My recollection is that it's described as EFEP. You're asking me if the product itself has the P in it? Yeah, because the label truly doesn't matter for Claim 19. The question is, does the Claim 19 language, which doesn't have any initials in it—it's just ethylene, blah, blah, blah—does that match, does that read on the accused Daikin material? I don't know the answer to that, Your Honor. I don't know. I'm looking at the Daikin materials to see if it states... There's no reason to delay. Do you want to turn briefly to the obviousness issue? Yes. And in particular, your friend's argument with respect to... Excuse me? In particular, with respect to your friend's argument on fragrance being non-fragrance claims, et cetera, which I'm not sure I saw a response to. Certainly, Your Honor. The... As Judge O'Malley mentioned, the claims and the patent are all directed to fragrance and... The specification is directed to fragrance and material to be applied to the skin. The Claim 15 is not so limited. It applies to a dispensing product. However, the testimony at trial was that this material, EFEP, was considered toxic, and we have at page 23 of Arborese, Zeus, which is Valois' contract manufacturer... Yes, I'm sorry, Your Honor. The information before the trial court included an admission by Wrexham. Now, Wrexham Dravey, who was the global head of product development, and he admitted that people of skill in the art considered this material to be carcinogenic and toxic. Did he use language like that or something in some substance about people of skill in the art? He did not. He did not. However, he was... And we're talking specifically about the summary judgment stage, because having ruled on this at summary judgment, it doesn't seem to me it's permissible for us to consider anything that happened at the trial. This is in his deposition. Submitted at summary judgment. Submitted at summary judgment. Do you have a cite for that in the appendix, just so we can refer to it? There are lots of volumes here. There are lots of volumes, Your Honor. Dravey was surprised and concerned that Calamer was using a fluoropolymer because he generally regarded it to be carcinogenic, A2654-56. Now, the defendants tried to dismiss that testimony on the basis that the person who stated it was not a person of ordinary skill in the art. However, he was the global head of product development. He was acknowledged to be a technologist who understood the materials at issue. And, importantly, he was a 30B6 designee. So, therefore, his statement is binding, certainly on Rexham. Now, with respect to Valois, their material scientists produced an email in which they stated that they were concerned about the use of this material because during the extrusion process, it has to be melted and it gives off toxic fumes. In addition, they were also concerned because their customers would be afraid to use a product with EFEP in it because of the carcinogenicity concerns. So, this evidence was ruled before the district court. The only evidence that was before the district court that was attempted to counter that was a one-page cutout from a plastics industry trade group that said some fluoropolymers have been FDA approved. That's not the FDA saying that. There's no citation to the FDA anywhere. We don't know that they're talking about EFEP in that statement. They also go on to say, but use this stuff with caution and talk to your lawyers and make your own determination. So, with all due respect to my colleagues on the other side of the aisle, it seems to me that in summary judgment, they failed to raise a genuine issue of material fact on teaching away. And that is very important, obviously, with respect to obviousness. There were also other factors that the court looked at and considered in terms of the obviousness analysis. Among those, I would like to mention the fact that both of these defendants tried and failed for years and years to come up with this. Galois says tried and failed for years is really not an apt description. That back in, was it 86 or 96? I think it was 86. They thought, hmm, this might be interesting. They looked at it, said, oh, we don't see how to do it. And then they forgot about it for 15 years or, yes, 15 or 20 years even. That doesn't tell one very much. It may tell you a little something, but not very much about recognizing a technical problem persistently in a long-felt-need kind of way and being unable to solve the problem. It might mean no more than this would have been nice. We don't see how to do it. This is about 47th on our list of things to think about. There's hardly any demand for this. We're just not going to put any effort into it. 17, 18 years later, they come back and say, oh, there's actually an interest in this. Oh, it's very easy to see how to do it. Well, I would say there are two answers to that. First, the evidence that was submitted showed that the industry was in search of this particular item, an invisible dip tube. And then when the patentees came up with it, it was sort of met with this, aha, finally someone has done it. This isn't something that was of no consequence to the industry for years and years and years. And we cited to accolade after accolade after accolade. So this was an important development and something that had been long sought. Secondly, Valois, as I understand it, had two development efforts, the one you're referring to, which was some time ago. But they also started another one in 2003, and they still failed to come up with an invisible dip tube. Now, the only thing I saw about that second effort in Valois' reply is they say, oh, but EFVP was not available in commercial quantities at that point in time. So we weren't able to test it. That is not, in fact, true, because the record shows that A5194, that Mead, Westvaco, was able to buy 50 pounds of EFVP in 2002, which is at least a year before they started their second. Well, who's the manufacturer of plastics, Daikin or something? Daikin. Daikin. Wasn't that a 2003 event where he started manufacturing stuff commercially? Am I missing something from what I read in the record? We have an invoice in the record where it was purchased in 2002, 50 pounds of this material was purchased in 2002. No, but you suggested that what they were saying was misleading, and I thought I recalled their statements with regard to that, with regard to this manufacturer doing something in 2003. Making it available in commercial quantities, but that's not relevant to the question of could they have known that it was available, at least for testing. The question can't really be could they have known. Objective and Disha are trying to make a common sense judgment about various facts in the world that point one way or another toward whether relevant skilled artisans, on the assumption that they know all of the prior art, would have been motivated to combine or something like that. Say Daikin had just created this, but it wasn't really very widely known. And so maybe Valois didn't hear about it because it wasn't being sold in commercial quantities for a while and therefore didn't focus on it with a level of demand for this being tiny. They weren't going to put in a lot of effort. Once it became apparent to them and once they had a competitor, they said now we'll put in the effort. It turns out technologically there's no problem here. Well, I'd like to go to that last point if I could, because this is something that defendants do raise repeatedly. They say, well, this is a simple invention. You take the refractive index of perfume and you find the material that's got the same refractive index and you match them up and it's no brainer. I think there are two problems with that. First, there's nothing of record in the prior art to show that any person of ordinary skill knew what the refractive index of perfume was or that these liquids, which can have all kinds of different carriers, excipients, aromatics, oils in them, would have a refractive index within such a small range. Secondly, after that was determined and the material was hit on, it didn't work. Is it difficult to determine the refractive index of any particular liquid that you're… I'm saying that that was not known… I'm just asking a factual question. I don't know. I don't know. But the other point that I'd like to make is that once the refractive index of this class of materials was determined and they found the material that had something in that range, they tried to make it to a visible dip tube and they failed. It didn't work. It was hazy. It wasn't transparent. They couldn't see through it. So they had to go and do more work, determine what the problem was, how to fix it and how to address it and come up with an invention that no one had before. Now, the defendants also like to say that we're claiming quenching as something novel. No, we're not. Quenching obviously has been known for a very long time. But there are lots of different processes available to the person of ordinary skill in the art to apply to these materials. And, for example, the patent itself and the specification at column 5, lines 10 to 25, talks about, well, we tried annealing. It's another known method of producing crystallinity. And they got crystallinities of 13, 18 and other percents listed here. But the tubes were hazy. They weren't insufficiently clear. It didn't work. So to say that this was just matching one material with one refractive index is to belittle the invention. Okay. I have the argument. Thank you. All right. We'll retain three minutes for rebuttal, and you all can decide which way to split that up. I'm going to try to speak quickly. On the obviousness point, I just want to clarify a couple of things. There was no 2003 failed effort by Valois. You will search the record in vain for that. In 2003, EFEP was available, and it was a matter of weeks to develop it. Was there a 2003 failed effort of Rexent? That I don't know about, Your Honor. I apologize. As far as the refractive index of fragrances not being known, that's nonsense. During the prosecution, the examiner in 1037 in the appendix said the refractive index of fragrances has been disclosed in the prior art, and he stated the range. And as I said before, that's an inherent property of a prior art material. It's not novel to discover that. As for the only evidence on whether there was a concern about carcinogens, is this Vincent Rabey testimony, and there was nothing on the other side. That's just wrong, and I've mentioned the Diken promotion of EFEP for food processing, for medical devices, for a variety of things. And that was all material part of the summary judgment? Yes, absolutely. And the notion that the FDA approval didn't specifically relate to EFEP is irrelevant because the supposed concern was not specifically about EFEP. It was about the supposed concern about fluoropolymers. And even as to that, as counsel said in his argument, the concern was not with the products that had them in afterwards, but about the processing. So that's not really relevant to the finished product. The other thing I wanted to mention very quickly is, Judge Taranto, your question about quenching and isn't pulling it into this chamber, quenching. On that, in appendix 9646, one of the inventors said, extruding into something that's the temperature of ambient air is not quenching. You need something more to have quenching. And I understand inventor testimony isn't dispositive, but I think that's relevant to your question. Why don't we hear from your friend for the remaining minute? I think we all agree that relative testing has to use the identical parameters. In this case, the patent was written by tests conducted by Pharma that had entirely different software and an entirely different detector distance. It had several parameters that were undisclosed, just like in the Federal Circuit cases before. There's undisclosed parameters. There was a testimony that said that they were functionally equivalent, that testing was functionally equivalent. There is no evidence of equivalence. There's a footnote in the court's ruling that says equivalence was not raised. Had equivalence been raised? A different kind of equivalence, at least. Did their expert testify in substance? Yes, I tested using slightly different parameters from those specified, but my results scientifically lead to the conclusion that if you use the exact parameters, you'd get the number within the range. No, that's not what they testified. Their expert testified on several parameters that you would get something similar. It would be close. I agree with that. But he did not say that if you combine all these potential errors, that you would get an identical result. Now, this goes back to what I said earlier. What is a third party going to testify? I'm sorry. I want to be precise about this because this is, I think, one of your issues. He may not have said you would get an identical result. Did he say you would get a result under 13%? Yes. I think he testified using the various parameters. He got a result under 13%. Right, but he didn't use the full set of parameters required by the claim construction. Did he testify that he can tell from the result he got, that had he used the split and whatever the other ones that he didn't use, that the result still would have been under 13%? No, he testified it's three or four specific parameters of the 11 that he would get the same result. But basically, there were several other parameters he didn't testify to that. And each parameter, he didn't say it was identical, so you don't know what the error is. And cumulatively, the error could be substantial. You didn't have contrary evidence on this, or did you? We had some contrary evidence, but what happened is that they did not argue equivalence in this case. There's either literal infringement or equivalence, and what we have now is a hybrid. I wasn't talking about equivalence in that sense. I was talking about whether or not it's the functional equivalent of the testing, and that's what Judge Toronto was asking about. In this case, you've got a problem in that this was a trial. A judge sat through this for 13 days and listened to all this testimony and did not find your expert credible at all and found their expert credible on these particular points. Several points, but not all of them. He did never say cumulatively if you followed each of the parameters. Their expert never said this, and the court never said this, that you get the identical results or similar results. On the issue of irrelevant versus absolute. One final thought. One final thought is that Parmar had different parameters that was put into the patent that he used. Dr. Rieben states, meanwhile, he used another set of parameters, and those are relative tests. You can't use different parameters to get the same thing. So thank you very much. Time has expired. We thank both counselmen. I'd just like to remind you that we asked for a copy of the summary judgment briefing and also Judge Toronto's. May I ask you one thing just about the make-up of the interviews that they found that answered? Well, I think this is a little odd in terms of the form. If you have something you think you need to submit, then you can ask the court if you can submit that. Thank you. Thank you.